UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **THOMAS E. COOPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:13-cv-1741-WTL-TAB** |
| | ) | |
| **CELLCO PARTNERSHIP D/B/A** | ) | |
| **VERIZON WIRELESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Cellco Partnership d/b/a Verizon Wireless's motion for summary judgment (Dkt. No. 49).  This motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons, and to the extent, set forth below.

## I.      STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor.  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence

1

of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II.   **BACKGROUND**

The facts that follow are taken in the light most favorable to the Plaintiff, Thomas E. Cooper.[1]  Additional relevant facts are included in the Discussion section below.

Cellco Partnership d/b/a Verizon Wireless ("Verizon") is a wireless communication company with approximately 71,900 employees and retail offices conducting business in Indiana and throughout the United States.  Cooper began his employment in 1988 with GTE, one of Verizon's predecessors.  He started as a sales representative and was promoted several times over the years, including to Associate Director of Strategic Sales in 2001.  He was responsible for managing a sales team and handling major accounts in Indiana and, for a time, in some Kentucky markets.  He was also responsible for staffing his sales team.  Cooper received various pay increases and awards throughout his employment, including induction into the "Winners Circle" and the "President's Cabinet."

In August 2011, he began reporting to Eric Spadafora, Director of Business Sales in the Michigan/Indiana/Kentucky ("MI/IN/KY") region.  That same year, Cooper received the Associate Director of the Year award for the MI/IN/KY region.

Verizon uses several metrics to evaluate employee performance.  Each year, Cooper received a year-end evaluation, showing mixed results in recent years.  In 2008, Cooper received a rating of "performing" on his year-end evaluation.  "Performing" meant "[e]mployee consistently attains and may periodically exceed job requirements."  Dkt. No. 63-2 at 3.  In 2009,

---

[1]  Many of the "facts" contained in the Plaintiff's Factual Background and Statement of Material Facts in Dispute section are not supported by the evidence of record.  The facts set forth herein are those that are supported by the record.

Cooper received a rating of "developing."[2]  "Developing" means "[e]mployee meets some but not all job requirements, improvement needed." [3]  Dkt. No. 63-2 at 3.  In 2010, Cooper again received a "performing" rating.[4]  With Spadafora as his supervisor, Cooper received a rating of "performing" on his 2011 year-end evaluation.

By May 2012, however, Spadafora began documenting what he perceived to be Cooper's performance deficiencies.  He drafted what he termed a "PIP Written Warning" for Cooper and sent it for review to Stacy Sturgill, Associate Director of Human Resources for the MI/IN/KY region.  Dkt. No. 51-4 at 2-5.  It was customary for him to seek guidance from human resources on implementing performance improvement plans.

In this draft warning, Spadafora outlined areas in which he believed Cooper's performance and leadership were lacking.  Sturgill commented on the draft document and, in one instance, questioned whether Cooper was different or being held to a different standard because Spadafora included a performance issue related to Cooper's lack of a recruiting funnel, and she thought that "[n]ot one of [Spadafora's] managers maintain[ed] a proactive recruiting funnel." Dkt. No. 63-4 at 3.

Spadafora revised the document, and on June 21, 2012, he issued to Cooper a Written Performance Discussion-Verbal Warning for Professional Conduct and Lack of Leadership

---

[2]  Cooper states that "[i]n [his] 2009 'developing' evaluation, his supervisor at the time stated 'your team has delivered improved results in customer growth and [] your team continues to improve under your leadership.'"  Pl.'s Br. 4 (citing Dkt. No. 51-9 at 6-12).  The quoted text, however, is nowhere to be found in Cooper's 2009 evaluation.  *See* Dkt. No. 51-9 at 7-12.

[3]  The 2010 through 2012 evaluations use a slightly different definition for "developing." "Developing" meant "performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed."  Dkt. No. 51-2 at 91.

[4]  The 2010 through 2012 evaluations use a slightly different definition for "performing." "Performing" meant the "[e]mployee sustained performance meeting objectives, requirements and expectations and periodically exceeded them."  Dkt. No. 51-2 at 91.

("Verbal Warning").  Dkt. No. 51-2 at 100-02.  Spadafora provided the document to Cooper

about ten minutes before a meeting with Cooper's team, so they did not discuss the document at

that time.  Dkt. No. 63-1 at 9-10.  Spadafora dropped the document on the table and told Cooper,

"Tom, I like you, but you've been in the job too long.  It's time for you to move out.  I'll do

whatever I can to help you."  Dkt. No. 63-1 at 10.  Spadafora did not mention his age at all.  Dkt.

No. 51-1 at 27.

On July 2, 2012, Cooper and Sturgill had a conference call to discuss the Verbal Warning

and Cooper's response.  Dkt. No. 63-1 at 11-12.  Prior to the call, Cooper provided to Sturgill a

41-page response to the Verbal Warning.  Pl.'s Br. 8.  In addition to discussing various issues

raised by the Verbal Warning and Cooper's response, Cooper raised concerns of age

discrimination during the call.  Dkt. No. 51-5 at 5-6.

Following that conversation, Sturgill investigated Cooper's age discrimination complaint.

On July 3, 2012, she spoke with Spadafora regarding Cooper's complaint.  Dkt. No. 51-5 at 9.

She also reviewed Spadafora's hiring decisions for Associate Director positions and found that

he had hired two Associate Directors, Marion Nolan and Marilyn Griggs.  Marion Nolan and

Marilyn Griggs were ages 55 and 50, respectively, at the time of hire.  Dkt. No. 51-13 at 4.  In

addition, she reviewed documents to identify additional individuals Spadafora had put on

progressive discipline.  Dkt. No. 51-5 at 11-12.  She determined that Spadafora had issued

progressive discipline to one other individual, who was 44 years old at the time.  Dkt. No. 51-5 at

11; Dkt. No. 51-13 at 3.  That individual was disciplined for "overall performance" / "overall

leadership."  Dkt. No. 51-5 at 11.  He left the company voluntarily in Fall 2012.  *Id.*  Sturgill also

spoke with in-house counsel regarding Cooper's age discrimination complaint.  Dkt. No. 51-5 at

12.  When she had concluded her investigation, she contacted Cooper by telephone to let him know that she "did not find any merit to his concerns."  Dkt. No. 51-5 at 12.

Despite receiving discipline regarding his performance and lack of leadership, Cooper and his team were meeting or exceeding a set of objective sales measures.  In addition to other performance ratings, Verizon began using "scorecards" in 2012 to evaluate certain sales performance indicators.  Scorecards provided an objective measure of whether sales teams were meeting specific sales goals.  Each Associate Director was expected to achieve at least eighty-percent attainment of the scorecard's performance goal each quarter, as measured on a three-month rolling average.  If an Associate Director did not meet scorecard requirements, she would potentially be subjected to progressive discipline.  Cooper and his team exceeded these objectives.  For example, they achieved 101% and 111% attainments for the third and fourth quarters of 2012, respectively.

On July 30, 2012, Verizon issued Cooper a mid-year review.  Dkt No. 51-4 at 63.  Cooper met objectives in the categories of supervisor responsibilities and training.  Dkt. No. 51-4 at 64, 67.  He met most of the core values and team development categories' requirements, with the exception of an unacceptable level of churn and recruiting and staffing, as his team still contained vacant positions.  *Id.* at 64, 68-69.  He failed to meet the objectives in the following categories: productivity, customer experience, and reporting.  *Id.* at 64-67.

On January 31, 2013, Cooper received a year-end review for 2012.  Dkt. No. 51-4 at 71.  His overall rating was "developing."  Dkt. No. 51-4 at 83.  Cooper met objectives in the categories of supervisor responsibilities and training.  Dkt. No. 51-4 at 77.  He failed to meet the objectives in the core values, productivity, customer experience, and reporting categories.  Dkt. No. 51-4 at 72-79.  He was then placed on a performance improvement plan.  Spadafora's

5

performance summary indicated that "[Cooper] is not meeting the minimum requirements of the Associate Director of Strategic Sales position.  He had previously been placed on a performance improvement plan for his lack of leadership in 2012 and I have not see [sic] the results improve at all in 2012."  Dkt. No. 51-4 at 80.  Cooper provided comments rebutting specific examples of lack of performance.  Dkt. No. 51-4 at 81-83.

On February 8, 2013, Spadafora issued Cooper a Written Performance Discussion-Written Warning ("Written Warning").  *See* Dkt. No. 51-2 at 103-05.  The Written Warning documents a number of performance deficiencies and also several conversations Spadafora had with Cooper.  *Id.*  It also included a number of objectives and action items for Cooper to work on moving forward.  *Id.* at 104.  Spadafora initially created the discipline as a final written warning, but Sturgill recommended issuing a written warning instead as it had been over six months since Cooper received the Verbal Warning.  Dkt. No. 63-3 at 6-7.  Cooper drafted a written response to the discipline and provided it, along with a suggested action plan he developed, to Sturgill on February 28, 2013.  Dkt. No. 51-2, at 106-08.  He also spoke with Sturgill regarding the discipline and his response.  Dkt. No. 51-5, at 13-14.

In April 2013, when the office in which Cooper worked was preparing for remodeling, Spadafora was informed by Deborah Biddlecombe, Associate Director of Sales Operations, that Rachel McDuff, Administrative Coordinator, found three boxes in a storage closet containing approximately 300 phones.  Dkt. No. 51-2 at 111-12.  The phones were intrinsically safe phones, a special kind of device that had been used in the construction industry.  A customer had requested to purchase the phones from Cooper in 2011, but did not complete the purchase.  Pl.'s Br. 13.  Cooper had ordered the phones from a Verizon office in Texas and, after the sale fell through, he attempted to return the phones to the Verizon warehouse.  Cooper was told that

Verizon no longer stocked that type of phone in the warehouse, so he should keep them in the Indianapolis office.  He spoke with other Associate Directors and also with his team to see if they could sell the phones, but they did not find a customer for them.  Instead, the phones were placed in a locked closet in the Indianapolis office.  When located in the closet in April 2013, the phones were essentially obsolete.  Spadafora, however, had inquired into demand related to intrinsically safe phones in September 2012.  Dkt. No. 63-7 at 72.  There appeared to be some demand for them at that time.  *Id.*

When Spadafora learned of the intrinsically safe phones from Biddlecombe, he asked Cooper to provide him with background on the phones.  Dkt. No. 51-2 at 109.  It was Spadafora's understanding that Cooper decided to take the phones out of inventory and put them in a closet after they were not sold.  Dkt. No. 51-3 at 23.  Spadafora indicated that Cooper at no time had informed him that he had the phones.  Dkt. No. 51-4 at 59.  Cooper testified that he believed Spadafora knew about the phones prior to April 2013.  First, he said that Spadafora toured the Indianapolis facility and was shown the phone closet.  Dkt. No. 63-1 at 31.  He believes that they discussed the phones.  *Id.*  Second, he testified that he either verbally or by e-mail told Spadafora about them in September 2012 when Spadafora requested information on demand for intrinsically safe phones.  Dkt. No. 63-1 at 32.

On May 9, 2013, Spadafora sought approval for Cooper's termination.  *See* Dkt. No. 51-4 at 59-62.  In his request, he explained that Cooper's "continuing lack of leadership and professionalism and complete disregard for company assets and policies" were the reasons Spadafora was seeking approval for Cooper's termination.  *Id.* at 59.  Sturgill reviewed and revised the termination request, approved it, and sent it to her supervisor for review.  *See id.* at 62; Dkt. No. 51-9 at 5.

Cooper was terminated from his employment with Verizon on May 23, 2013.  Cooper discussed his termination with Sturgill.  At Cooper's request, Verizon allowed Cooper to retire.  At the time of his termination, eight Associate Directors reported to Spadafora.  Cooper had worked for the Defendant longer than any other Associate Director.

Cooper filed a charge of discrimination with the Equal Employment Opportunity Commission on August 19, 2013.  Receiving no right to sue letter after more than sixty days passed since the filing of his charge, Cooper filed his Complaint in this Court on October 30, 2013.

### III.   DISCUSSION

Cooper asserts against the Defendant a claim of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  The Defendant moves for summary judgment with respect to Cooper's claim.  Under the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To survive a motion for summary judgment on an ADEA discharge claim, a plaintiff must present evidence of intentional discrimination through either the direct or indirect method.  *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001).  Cooper argues that he can satisfy either method.

### A.   Indirect Method

To avoid summary judgment under the indirect method, a plaintiff must offer evidence that: 1) he is over forty years of age; 2) his performance met his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) a similarly situated,

substantially younger employee was treated more favorably. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002). A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects. *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014). If a "plaintiff is unable to establish each element of this *prima facie* case, summary judgment must be entered in favor of the defendant." *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 676 (7th Cir. 2006). If a plaintiff establishes his *prima facie* case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the adverse employment action. *Tank*, 758 F.3d at 809. On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.*

Because Cooper was 62, he satisfies the first element of his *prima facie* case. It is further undisputed that Cooper's termination is an adverse employment action; this satisfies the third element. Cooper also repeatedly refers to the Verbal and Written Warnings and negative performance evaluations he received, but these are not adverse employment actions. *See Oest*, 240 F.3d at 613. "[T]hey can [though] constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute." *See id.* (citation omitted).

With regard to the second element of his *prima facie* case, although Cooper primarily argues that he was meeting Verizon's legitimate performance expectations, he admits that he was not meeting some of the performance expectations for which he was disciplined. *See, e.g.*, Dkt. No. 55 at 8-9. He claims, however, that younger Associate Directors were not held to the same standards and were not disciplined for the same issues for which he received discipline. Pl.'s Br. 20. "When a plaintiff produces evidence sufficient to raise an inference that the employer

applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a *prima facie* case by establishing that similarly situated employees were treated more favorably." *Grayson v O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002) (citing *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329–30 (7th Cir. 2002); *Curry v. Menard*, 270 F.3d 473, 478 (7th Cir. 2001); *Johnson v. West*, 218 F.3d 725, 733 (7th Cir. 2000); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999)). The Court will assume for purposes of this Entry that Cooper has produced evidence sufficient to show that Verizon applied its legitimate expectations in a disparate manner and, for that reason, moves to the fourth prong of the *McDonnell Douglas* analysis.

Cooper argues that he meets his burden with regard to the fourth element because his replacement was 33 years old. Pl.'s Br. 18. That Cooper was replaced by an employee outside the protected class does not establish this element; rather, that "modified *McDonnell Douglas* test" applies in the context of a mini-reduction in force. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 689 (7th Cir. 2006) ("[U]nder the modified *McDonnell Douglas* test appropriate in a 'mini-RIF' situation, the fourth prong of the plaintiff's *prima facie* case is satisfied when the plaintiff demonstrates that her duties were absorbed by persons not in the protected class."). Cooper, however, was terminated for performance issues, so the proper inquiry is whether "similarly situated, substantially younger employees were treated more favorably." *Fleishman*, 698 F.3d at 609 (quoting *Franzoni*, 300 F.3d at 772).

Apart from his replacement, Cooper admits that he cannot point to any similarly "situated employee under forty for the purpose of comparison." Pl.'s Br. 16. There is, however, no requirement that comparators be outside the protected class. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (Comparators in an age discrimination case are

persons "substantially younger" than the plaintiff, regardless of whether they are members of the protected class). Instead, the *prima facie* case requires only that a comparator be "substantially younger." *Fleishman*, 698 F.3d at 609 (quoting *Franzoni*, 300 F.3d at 772). The Seventh Circuit considers "a ten-year difference in ages . . . to be presumptively 'substantial.'" *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).

Cooper names six Associate Directors as similarly situated comparators: Marilyn Griggs, James McIlhon, Michael Meier, Marion Nolan, Matthew Nixon, and Gary Rowe.[5] Of the six, two, James McIlhon and Marion Nolan, are fewer than ten years younger than Cooper. Accordingly, they are not presumptively substantially younger than Cooper and, therefore, they are not considered as comparators.[6] *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 619 (7th Cir. 2000) (finding seven- and 9½-year age differences not "substantial"). The other four employees are substantially younger: Marilyn Griggs is ten years younger than Cooper, and Michael Meier, Matthew Nixon, and Gary Rowe are more than ten years younger than Cooper.

The similarly situated test generally requires a plaintiff to show that the comparators had the same supervisor, were subjected to the same employment standards, and engaged in conduct similar to that of the plaintiff "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*, 219 F.3d at 617-18; *see also Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011).

---

[5] Cooper's argument is more fragmented than it appears here. In discussing *McDonnell Douglas*'s fourth element, he does not name the comparators. *See* Pl.'s Br. 20. Their names, however, are scattered throughout the fact section. *See* Pl.'s Br. 11-12.

[6] "In cases where the [age] disparity is less [than ten years], the plaintiff still may present a triable claim if []he directs the court to evidence that [his] employer considered [his] age to be significant," which might make the age disparity irrelevant "because the employee's case likely would be one of direct evidence, not the burden-shifting indirect evidence framework." *Hartley*, 124 F.3d at 893. Cooper has presented no such evidence.

Griggs, Meier, Nixon, and Rowe worked as Associate Directors at the same time as Cooper, were supervised by Spadafora, and performed work the same as or similar to Cooper. Cooper argues that these employees "were not meeting Verizon's criteria, [yet] they were not disciplined and were given 'performing' or 'leading' ratings" in their mid-year or year-end evaluations. Pl.'s Br. 11.

Specifically, Cooper argues that Rowe's 2012 year-end review ranked him as "performing," but "he was not meeting the criteria for sales activity, customer experience and quarterly business review." Pl. Br. 12. The evidence does not show that Rowe received more favorable treatment than Cooper. Rather, Cooper has taken the described performance indicators out of their proper contexts. In addition to an overall summary ranking, there are seven broad objectives that year-end evaluations cover: supervisor responsibilities, core values, productivity, customer experience, training, reporting, and team development. *See, e.g.*, Dkt. No. 51-5 at 71-79. Rowe did not fail to meet any of the seven objectives. Rather, he did not meet criteria related to three specific performance measures within the productivity and customer experience objectives. Cooper, on the other hand, failed to meet five of the seven broad objectives, including a number of quantitatively objective sub-categories within those objectives. In this respect, Cooper and Rowe are not similarly situated.

With respect to Griggs, Cooper argues that her 2013 mid-year evaluation stated that she was "performing well," but she "was not meeting the grow revenue requirements and was not meeting the customer experience requirements." Pl.'s Br. 11-12. Like the year-end evaluations, the mid-year evaluations also contain a number of broad objectives.[7] Griggs was not meeting

---

[7] The 2013 mid-year review contains nine, while the 2012 mid-year evaluation contained the same seven found in the year-end review. See Dkt. Nos. 72 at 2-7 and 51-4 at 63-70, respectively.

two of the nine broad objectives by which she was evaluated.  In both instances, however,

Spadafora indicated that Griggs was "very close to meeting the objectives" and thought that they

"[could] be achieved by the end of the year."  Dkt. No. 72 at 3-4.  Cooper was terminated prior to

the 2013 mid-year review, but when compared with his 2012 mid-year review, he and Griggs are

not similarly situated.  Cooper failed to meet three of the seven broad objectives, and there is no

indication in the review that he was close to meeting the objectives or could achieve the

necessary results by the end of the year.  *See* Dkt. No. 51-4 at 63-70.  As was also the case with

Rowe, Cooper points to no other instances of more favorable treatment related to Griggs and

does not suggest that she should have been disciplined or terminated for these or other

performance issues.

   With respect to Nixon, Cooper again turns to disparities in year-end evaluation results.

Cooper notes that Nixon's 2012 year-end evaluation ranks him as "leading," but he "was not

meeting several categories of productivity and personal sales activity among other things."  Pl.'s

Br. 11.  Unlike Cooper, Nixon did not fail to meet any of the seven objectives.  *See* Dkt. No. 72

at 31-39.  Rather, like Rowe, he did not meet criteria related to a few specific performance

measures within the productivity objective, but he was also leading the Associate Directors in

other metrics.  *Id.*  In this respect, Cooper and Nixon are not similarly situated.

   Cooper also alleges that he was written up for failing to win the Rolls Royce account

while "at least one other associate director failed to procure a large account and was not written

up."  Pl.'s Br. 19.  The Court assumes that Cooper is referring to Meier and finds no evidence in

the record referring to any other Associate Directors failing to procure accounts.  Spadafora

testified that "[Cooper] was never written up for not getting the Rolls Royce contract"; rather,

that failure was referred to "[a]s an example of his lack of engagement and lack of leadership,

not because he didn't win the business." *Id.* at 14-15.  The Verbal Warning supports Spadafora's testimony that the failure to win the Rolls Royce account is but one example of Cooper "not own[ing] relationships with key accounts," a facet of his lack of engagement and leadership.  *See* Dkt. No 55 at 5.  Again, Cooper has not shown that he and Nixon are similarly situated.  Cooper does not present evidence that he was disciplined for failing to win the Rolls Royce account, nor does he show that Nixon otherwise had the same performance issues that were addressed in his Verbal Warning and was not disciplined.

Cooper argues that Meier was treated more favorably with respect to the outcome of his 2012 mid-end evaluation and that "Spadafora chose not to discipline him for not meeting his Scorecard and instead helped him obtain a different position in the company."  Pl.'s Br. 11-12; *see also id.* at 20.

With respect to Meier's mid-year evaluation, it does not appear that Meier failed to meet any of the broad objectives evaluated, *see* Dkt. No. 72 at 23-29, whereas Cooper failed to meet three of them.  *See* Dkt. No. 51-4 at 63-70.  Cooper points out that Meier failed to meet various objective measures within the broad objectives, but this, again, is not comparable to failing to meet the broad category objectives.  In addition to the performance issues in his mid-year evaluation, Meier also did not meet the eighty-percent requirement on the scorecard evaluation, a metric that Cooper met.  Dkt. No. 71 at 2.

Cooper argues, without evidentiary support, that "Verizon's policy was to subject associate directors [to discipline] for failing to meet this objective criteria" and that Meier was not disciplined.[8]  Pl.'s Br. 20.  With this added performance failure, Meier comes closer to the

---

[8]  Cooper cites to Spadafora's deposition testimony at 140:16-141:2 [Dkt. No. 71 at 2-3] to support his proposition regarding Verizon's policy, but the cited testimony does not address

similarly situated mark than the other comparator employees.  There are, however, "differentiating or mitigating circumstances" that distinguish Meier's conduct from Cooper's "or the employer's treatment of [the two employees]."  *Radue*, 219 F.3d at 617-18.  Spadafora testified that Meier "took on a new team, a new assignment . . . and for the first quarter of this assignment was treated as a new hire and thereby was not put into a performance management situation."  Dkt. No. 71 at 3.  In this respect, Meier was not similarly situated to Cooper.  Despite the lack of disciplinary action against Meier, Spadafora testified that he nonetheless spoke with Meier regarding performance issues around the end of the second quarter of 2012, a conversation that he characterized as "very similar in nature to the one that I had with [Cooper on June 21, 2012]," and Meier stated that he wanted to move into another division of the company, Dkt. No. 71 at 3, which he did in July 2013.  *See* Dkt. No. 61 at 3.

Although these employees were not meeting every performance indicator by which they were evaluated, Cooper has not provided evidence that the Associate Directors who avoided reprimand and termination shared a "comparable set of failings" with him.  *Fass v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (internal quotations omitted).  Verizon's reason for terminating Cooper was his "continuing lack of leadership and professionalism and complete disregard for company assets and policies."  Dkt. No. 51-4 at 59.  Other Associate Directors may have failed to meet various performance metrics, but Cooper does not allege that they exhibited his other performance deficiencies, such as his continuing lack of leadership or disregard for company assets and policies.  *See, e.g.*, *Burks v. Wis. Dep't of Transp.*, 464 F.3d

---

this topic.  Testimony from Sturgill, on the other hand, stated that those with scorecard deficiencies could "potentially" be held to progressive discipline.   Dkt. No. 63-3 at 9.

744, 751-52 (7th Cir. 2006).  As a result, none of the individuals is similarly situated.  *Fass*, 532 F.3d at 642-43; *Burks*, 464 F.3d at 752.

Drawing all reasonable inferences in Cooper's favor, the Court finds that Cooper has not demonstrated that there is a genuine issue of triable fact as to whether similarly situated employees outside the protected class were treated differently.  Cooper, therefore, did not establish a *prima facie* case under the indirect method.

Furthermore, the Court notes that in addition to being unable to establish his *prima facie* case, Cooper also has not submitted evidence that creates a genuine issue of material fact with regard to the issue of pretext.

Cooper claims that Verizon's legitimate performance expectations were disparately applied.  As a result, the Court combines the second prong analysis with the pretext analysis. *Faas*, 532 F.3d at 642; *see also Hague v. Thompson Distribution Co.,* 436 F.3d 816, 823 (7th Cir. 2006) ("[I]f the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying."). Cooper must demonstrate sufficient evidence of pretext in order to show that he was meeting Verizon's legitimate performance expectations.

"To demonstrate a material issue of fact as to pretext, [a plaintiff] must show that 'either 1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible.'" *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).  "An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated

16

reason or the employment decision 'was a lie—not just an error, oddity, or oversight.'" *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010)).

In each instance of discipline, Cooper provides explanations for why he believes the performance deficiencies were out of his control or why his actions did not merit discipline.  He also attempts to create an issue out of whether Spadafora knew about the intrinsically safe phones prior to their reappearance in April 2013.  As Verizon notes, this is not a material fact.  Def.'s Reply 12.  Even if Spadafora had previously been informed that the phones were there, that does not change the fact that Cooper was responsible for them and that he failed to deal with them appropriately.  To Spadafora, this was just another example of Cooper's lack of leadership.  He again was not taking ownership as an Associate Director.  As Sturgill noted in Spadafora's request to terminate Cooper, "[Cooper] has not taken ownership of his performance or done anything proactively to improve his leadership.  Eash [sic] time I investigate, I find no wrongdoing on the part of the director.  Instead, I find that there is always a lack of communication or understanding on [Cooper]'s part of his performance deficiencies and the seriousness of them."  Dkt. No. 51-4 at 62.

As Verizon notes, Cooper's situation is analogous to the plaintiff's in *Widmar v. Sun Chem. Corp.*, 772 F.3d 457 (7th Cir. 2014).  In *Widmar*, the plaintiff was terminated for performance reasons after sixteen years as a plant manager.  *Id.* at 459.  Widmar did not believe that the problems identified by his employer were his fault.  *Id.* at 460.  Instead, he believed that his employer "falsely blamed [him] to cover up for the fact that it was firing him because of his age."  *Id.*  Many of the performance problems identified by his employer were, Widmar believed, simply problems with products produced in the plant, not problems with his performance.  *Id.* at

464.  He did not believe that those product issues were his fault.  *Id.* at 463-64.  The company

disagreed because, as plant manager, Widmar was responsible for "seek[ing] out problem areas,

even if they were the 'fault' of others and fix[ing] them."  *Id.* at 464.  At one point, Widmar,

similar to Cooper, claimed that his supervisor knew of a problem but still blamed him for it.  *Id.*

at 466.  As is the case with Cooper, the dispute centered on the employee's understanding of the

scope of his responsibilities.  *Id.*  The Seventh Circuit found that Widmar failed to offer any

evidence of pretext, noting that "[i]n each case the result is the same.  Widmar claims he is not at

fault.  Sun Chemical expected him to be more proactive and less finger-pointing in his approach

to management."  *Id.* at 467.

     The Court finds the same result here.  Cooper had performance deficiencies that he

believed were out of his control.  Verizon disciplined him for his "overall lack of performance,

accountability and leadership for his sales team," providing him numerous examples to support

its position.  *See, e.g.*, Dkt. No. 51-2 at 103.  Cooper has provided "nothing more than

speculation that the blaming was a mask for discrimination."  *Widmar*, 772 F.3d at 465.  As the

Seventh Circuit notes, a pretext means "something worse than a business error; pretext means

deceit used to cover one's tracks.  Being blamed unfairly is not evidence of deceit."  *Id.* at 466

(internal quotation and citation omitted).  Cooper has failed to offer evidence from which a

reasonable jury could conclude that Verizon's reasons for his termination were pretextual.

### B.    Direct Method

     "To avoid summary judgment under the direct approach, the plaintiff must produce

sufficient evidence, either direct or circumstantial, to create a triable question of intentional

discrimination in the employer's decision."  *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d

729, 733 (7th Cir. 2011).  When no statements exist that directly evidence discrimination, such

as "I fired Judy because she was an old woman," *Gorance v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001), a plaintiff can survive summary judgment by "constructing a convincing mosaic of circumstantial evidence" that would permit a reasonable jury "to infer intentional discrimination by the decisionmaker." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). Generally, but not exclusively, the pieces of the mosaic will fall into three categories: 1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of [discriminatory] intent might be drawn"; 2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Perez v Thorntons, Inc.*, 731 F.3d 699, 711 (7th Cir. 2013). In sum, if the aggregation of circumstantial evidence is sufficient to suggest that an employment-related decision was based on age, granting summary judgment is inappropriate. *See Sylvester v. SOS Children's Vills. III., Inc*., 453 F.3d 900, 904 (7th Cir. 2006) (analyzing evidence under mosaic theory in race discrimination context). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Cooper does not allege that the Defendant made statements directly evidencing discrimination. Instead, he argues that there exists a convincing mosaic of circumstantial evidence permitting the inference of intentional discrimination on the part of Spadafora. He attempts to create his mosaic from various pieces of evidence as follows.

Cooper cites two statements made by Spadafora as evidence of discriminatory intent: First, he alleges that at the time he was issued his Verbal Warning on June 21, 2012, Spadafora, said to him: "Tom, I like you, but you've been in the job too long. It's time for you to move out.

I'll do whatever I can to help you." Dkt. No. 63-1 at 10.  Second, he attributes the following statement to Spadafora:  "[T]enured employees did not sell new products and services as well as newer employees."[9]  Pl.'s Br. 5.

Cooper also characterizes the timing of his termination as suspicious because he was terminated prior to being subjected to all of the steps in Verizon's progressive discipline process.  Pl.'s Br. 17.  Cooper reasons that "[Human Resources] would not allow Spadafora to issue a final written warning," so he "concocted a reason to immediately terminate Cooper."  Pl.'s Br. 17.

Cooper also argues that he was singled out for an audit and "belittled and treated more harshly than the younger associate directors."  Pl.'s Br. 17, 20.  Cooper testified that Spadafora chastised him in front of his peers on "pretty much every" staff meeting telephone call in the weeks before he was terminated and less often prior to that time.  Dkt. No. 63-1 at 27; 29.  He specifically remembered that, on one of the calls, Spadafora asked him, "Did your people go to sleep this month?" and that, although he could not remember any other specific statements, Spadafora's voice inflection was "somewhere between mocking and derision."  Dkt. No. 63-1 at 28.

As further evidence of the mosaic, Cooper points to Sturgill's questioning Spadafora regarding a comment he included in a draft of the Verbal Warning.  Pl.'s Br. 17.  He stated: "[Cooper] has not been able to maintain a recruiting funnel for his team, which is required in his role."  Sturgill's explanation Dkt. No. 63-3 at 3-4.  Sturgill responded as follows: "I don't

---

[9]  Verizon argues that this comment is inadmissible hearsay.  However, in defending against the discrimination claim by another employee, Verizon itself stated that Spadafora made that comment.  *See* Dkt. No. 75, at 8.  Accordingly, pursuant to Federal Rule of Evidence 801(d)(2), it appears to the Court that it is a statement by a party opponent and therefore is not hearsay.

understand this one.  Not one of your managers maintains a proactive recruiting funnel.  I'm not sure how Tom is different or why we are holding him to a different standard."  Dkt. No. 63-4 at 3.

Viewing the facts in Cooper's favor, the Court is unpersuaded that the evidence creates a triable issue of discrimination under the direct method.[10]  The comment made by Spadafora at the time of Cooper's June 21, 2012, Verbal Warning does not refer to Cooper's age and was unrelated to the termination decision.  *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998) ("When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant . . . only if they are both made by a decisionmaker and related to the employment decision at issue.").  Cooper himself conceded in his deposition that the same comment could be made to someone outside the protected class.  He agreed that "[i]t's not just older employees who lose their effectiveness in a position," and that possibly "[s]omebody who others would describe as young can be in a position too long and lose their effectiveness in that position."  Dkt. No. 51-1 at 27-28.  He also admitted that Spadafora did not mention his age.  Dkt. No. 51-1 at 27.  Moreover, Cooper testified that, in the same conversation in which Spadafora told him that he had "been the job too long," he also said, "I'll do whatever I can to help you."  Dkt. No. 63-1 at 10.  Coupled with Spadafora's clear statement of his intent to help Cooper, Spadafora's comment just as readily could have referred to Cooper's lack of effectiveness as an Associate Director rather than Cooper's age.  Cooper's belief that the

---

[10]  Cooper reiterates additional arguments already addressed in the indirect method analysis: According to Cooper, not only was he replaced by a younger employee, but younger associates were not held to the same standard as he was and were not disciplined for the same issues for which he received discipline or when company policy indicated that they should have been.  Pl.'s Br. 17.  As discussed above, the evidence of record does not support these arguments.

comment proves age-related bias on the part of Spadafora does not create a genuine issue of

material fact.  *See Fairchild*, 147 F.3d at 574 (quotation omitted); *Mills v. First Fed. Savings and*

*Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996) (quoting *Visser v. Packer Eng'g*

*Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) ("[I]f the subjective beliefs of plaintiffs in

employment discrimination cases could, by themselves, create genuine issues of material fact,

then virtually all defense motions for summary judgment in such cases would be doomed.")).

Similarly, Spadafora's comment regarding "tenured employees" does not suggest

discriminatory intent.  It is unclear from the record whether the comment was made to Cooper,

related to him in any way, or was even made while he was employed by Verizon.  And again, the

comment does not refer to the age of any employee and could just as easily be directed at

employees outside the protected class.  This comment is too ambiguous to allow an inference of

discriminatory intent.  *See Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1122 (7th Cir. 1998) (comment

not regarding age and referring to another employee not probative of intent to discriminate

against plaintiff on the basis of his age).

The fact that Spadafora did not follow all steps in Verzion's progressive discipline

process also is not indicative of discrimination in this instance.  *Cf. Hanners v. Trent*, 674 F.3d

683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established

policies or practices can no doubt be relative and probative circumstantial evidence of

discriminatory intent.").  Progressive discipline under Verizon's policy was not mandatory and

sequential.  Sturgill testified that there are three steps in the process, but that they do not

necessarily flow in "an A-to-C progression," and the process does not require "step[ping]

through all three in order to get to termination."  Dkt. No. 63-3 at 2.  In addition, Sturgill was

aware of the steps that Spadafora had taken in the progressive discipline process because she

reviewed and revised each disciplinary document before it was issued.  In addition, she reviewed the termination request and approved the termination herself.

Cooper's argument that he was singled out for an audit is not supported by the evidence. Spadafora conducted an audit of Cooper's year-to-date net performance because he found a substantial number of disconnected phone lines in two of Cooper's accounts.   Dkt. No. 70 at 2-3.  He believed that the company was "potentially losing money in [Cooper's] organization and he was unaware."  Dkt. No. 70 at 2-3.  Spadafora conducted an audit for the entire organization. Dkt. No. 63-5, at 3-4.  There is no material fact in dispute related to the audit.

With respect to Cooper's claim that he was belittled and treated more harshly, he does not provide any evidence that Spadafora's conduct was based on discriminatory animus.  The one comment he recalls is not inherently ageist, and despite Cooper's subjective belief, he does not present evidence that there was any connection between Spadafora's alleged mocking and derisive inflection and Cooper's age.  *See Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 574 (7th Cir. 1998) ("[S]ubjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact.") (internal quotation and citation omitted).

At first glance, Sturgill's suggestion that Spadafora was holding Cooper to a different standard in demanding that he maintain a recruiting funnel is Cooper's strongest evidence to support an inference of discrimination.  It appears, however, that Sturgill was incorrect when she said that "[n]ot one of [Spadafora's] managers maintains a proactive recruiting funnel."  Dkt. No. 63-4 at 3.  Performance evaluations for other Associate Directors indicate that Spadafora expected them to maintain recruiting funnels, and they did.  *See e.g.*, Dkt. No. 72 at 4, 18, 26, 36, 53, 70.  In 2012, both mid-year and year-end evaluations contain within the team development category a performance metric related to the Associate Directors' recruiting funnel: "Keep

23

prospect funnel of candidates (keep bench full) and achieve full staffing levels per the 2012 ramp plan." Dkt. No. 72 at 18, 26 (year-end and mid-year, respectively). Therefore, Spadafora was not holding Cooper to a different standard. He in fact expected Associate Directors to maintain recruiting funnels, and he used this measure to evaluate their performance. *See, e.g.*, Dkt. No. 72 at 19, 27, 36, 54, and 70, respectively (Spadafora's comments include the following: "[McIlhon] is at headcount and maintains an active bench"; "Micheal [sic] is doing a good job at recruiting and maintaining a solid bench of new candidates for all his positions"; "Matt is compliant with this metric though I would like to see a deeper bench from his BSM's and a stronger funnel of new hires to ensure his cycle time decreases going into 2013"; "Marion has really focused on staffing as a key differentiator for her organization and recruiting the right people is a strength she continues to leverage to achieve desired results"; "Steve has done fairly well in keeping candidates in the funnel but performed exceptionally well in hiring top quality B2B sales personnel"). Spadafora continued to use a similar metric in 2013. *See* Dkt. No. 72 at 4 (under the leadership description and measures in Griggs' mid-year review: "Headcount: Keep prospect funnel of candidates. Achieve and maintain full staff levels per the 2013 staffing plan"). Given this complete context, Sturgill's comments do not lend support for Cooper's mosaic theory.

Cooper has not constructed a convincing mosaic of circumstantial evidence that raises the inference of intentional discrimination. *See Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir. 2003). Taken together, the pieces of Cooper's mosaic do not "point directly to a discriminatory reason for the employer's action." *Adams*, 324 F.3d at 939. For all of the reasons stated above, Cooper's claim for age discrimination fails under the direct method as well.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Verizon is entitled to summary judgment on Cooper's claim and its motion for summary judgment (Dkt. No. 49) accordingly is **GRANTED**.  The Plaintiff's Motion to Amend Response in Opposition to Defendant's Motion for Summary Judgment to Label Statement of Material Facts in Dispute Pursuant to Local Rule (Dkt. No. 81) is **DENIED** as unnecessary.

SO ORDERED:  9/30/15

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification.